UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Dana S. Georges,
        Defendant/Appellant

        v.                                    Civil No. 05-cv-322-SM
                                              Opinion No. 2007 DNH 026
Exceptional Properties, Inc.,
        Plaintiff/Appellee

### O R D E R

Dana S. Georges appeals the decision of the United States
Bankruptcy Court for the District of New Hampshire (Vaughn, C.J.)
holding that: (1) he owes $361,087.50 to Exceptional Properties,
Inc. ("EPI"); (2) his debt to EPI is excepted from discharge
pursuant to 11 U.S.C. § 523(a)(4); and (3) he is not entitled to
discharge, pursuant to 11 U.S.C. § 727(a)(3).  After careful
consideration, the decision of the bankruptcy court is affirmed
in part and reversed in part.


**Standard of Review**

When appealed to a district court, a bankruptcy court's
legal determinations are reviewed de novo.  In re Gonic Realty
Trust, 909 F.2d 624, 626-27 (1st Cir. 1990); In re G.S.F. Corp.,
938 F.2d 1467, 1474 (1st Cir. 1991).  And, as observed by the
court of appeals for this circuit, "[e]xceptions to discharge are

narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." <u>Century 21 Balfour Real Estate v. Menna (In re Menna)</u>, 16 F.3d 7, 9 (1st Cir. 1994).

The bankruptcy court's findings of fact, however, must be accorded much greater deference.  Factual findings made in the bankruptcy court remain undisturbed unless clearly erroneous. <u>See</u> <u>Briden v. Foley</u>, 776 F.2d 379, 381 (1st Cir. 1985).  A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, after consideration of all evidence before it, is left with the definite and firm conviction that a mistake has been made.  <u>See In re McIntyre</u>, 64 B.R. 27, 28 (D.N.H. 1986).

## Background

The parties have stipulated to, or do not dispute, most of the relevant facts.  EPI is the owner of approximately 23 acres of land located on South Depot Road, in Hollis and Nashua, New Hampshire.  In 1995, it obtained a permit from the Hollis Planning Board allowing it to excavate up to 275,000 cubic yards of sand and gravel from the property (the town of Nashua

apparently did not require an excavation permit).  In 1997, the Town of Hollis authorized EPI to remove an addition 84,700 cubic yards of sand and gravel based upon EPI's revised excavation plans.

Prior to beginning any work at the property, EPI solicited bids for excavation of the site.  It accepted Georges' bid and, on March 22, 1996, the parties entered into a written contract entitled "Memo of Understanding."  Pursuant to that contract, Georges could purchase excavated material from EPI at a set price.  Initially, that price was set at $2.25 per cubic yard.  Subsequently, the price escalated to $2.50 and, eventually, to $2.75 per cubic yard.  The parties also agreed that, because EPI did not have any significant excavating equipment on the site, Georges would load excavated materials into vehicles provided by EPI and its customers, for which EPI would compensate Georges at the rate of $0.50 per cubic yard.

Georges began excavation operations at the site in early 1996.  Under the terms of the parties' agreement, Georges was to use an "in truck" method of accounting to determine how much material he was excavating from the site.  A principal of EPI instructed Georges to use estimates based upon the size of the

3

truck that was loaded.  So, for example, if he loaded a 28 foot trailer with material, Georges was told to record that as 22 cubic yards of material.  Similarly, if he loaded a 10-wheeled dump truck, Georges would record that as representing 14 cubic yards of excavated material.  And, if he loaded a 14-wheeled, tri-axle truck, Georges would record that as representing 18 cubic yards of material.  Importantly, Georges was told to record those estimated figures (which, again, were provided to him by one of EPI's principals) regardless of the actual volume of material loaded onto each individual truck.  EPI was aware of, and approved of, that method of accounting for the quantity of material removed from the site, and all of Georges' records were based on that estimated accounting method.  Naturally, the estimated quantities were just that — estimates.  All parties acknowledge that more material was removed from the site, legitimately, than was accounted for under the agreed-upon method.

Under the terms of the contract, Georges was required to submit weekly reports disclosing the reportable volume of material he removed from the site (using the parties' agreed-upon accounting method), as well as the reportable volume of material he loaded for EPI's customers.  As to the material Georges loaded

for EPI's customers, he provided EPI with slips that showed the customer's name, the driver's name, the type of truck, and the estimated volume of material loaded.  Those details allowed EPI to know which clients had obtained material from the site, how much they obtained, and how much EPI should bill them.  As to material Georges excavated and loaded for his own customers, he simply provided EPI with a total reportable volume (in cubic yards) of material that he sold.  It does not appear that EPI ever asked Georges to provide additional details (e.g., specific trucks loaded, driver, owner, etc.) with regard to material Georges sold to his own customers.  Each week, the parties would use Georges' reports to determine how much each owed the other and Georges would pay the balance he owed to EPI by check.

On April 20, 2000, EPI terminated the contract and, shortly thereafter, Georges removed his excavation equipment from the site.  Based upon his records, Georges claimed that he had removed a reportable total of 247,062 cubic yards of material from the site during his excavating operations.  But, after EPI surveyed the property as part of a plan to develop it as an age-restricted housing project, it became convinced that Georges had removed much more material from the site than he had reported.

Accordingly, EPI commissioned Cuoco & Cormier, Inc. ("C&C") to estimate how much material had been removed.

C&C had previously done engineering work for EPI and was familiar with the site.  It gathered information from various sources and constructed a topographical map of what it claimed the site looked like in 1995, shortly before Georges began excavating.  Then, by comparing that map to an on-the-ground survey completed in 2000, C&C concluded that 431,097 cubic yards of material had been removed from the site over that period of time.  Subsequently, based at least in part on an additional survey completed in 2003, and to account for what it called "fluff" and "swell", C&C revised its initial estimate upward, concluding that a total of 562,295 cubic yards of material had been removed from the site.[1]

---

[1]     The calculations relating to so-called "fluff" and "swell" were done in an effort to account for the fact that the topographical maps showed how many cubic yards of material had been removed from the ground.  When it is in the ground, material is compacted.  When it is removed, it expands and becomes looser as air is introduced.  Consequently, removed material occupies a greater volume of space.  Accordingly, ten cubic yards of compacted fill in the ground (as shown on the topographical maps) may expand into, say, eleven or twelve cubic yards once it is excavated.

Needless to say, C&C's estimate of how much material was excavated from the site between 1995 and 2000 says nothing about who was responsible for removing the "missing" material. EPI, however, was convinced that Georges had, in essence, stolen the missing material and falsely reported that he had removed only 247,062 cubic yards.

In response to EPI's claims, Georges testified that after the 1995 topographical map utilized by C&C was prepared, but before he began any excavating operations at the site in 1996, other parties had been running excavating operations there. He also testified that he was not the only party who was excavating and removing material from the property during the time that he was actually on the site; according to Georges, he informed EPI that other parties were encroaching on the site and removing fill from it – material that would be reflected in C&C's estimates as "missing," but which would not have been included in Georges' estimated accounting to EPI.

Finally, at trial, Georges testified that, when EPI terminated the contract and instructed him to remove his equipment from the site, he left approximately 2,500 cubic yards of his own loam on the site, valued at $10.00 per cubic yard.

Accordingly, Georges claims he is owed $25,000 by EPI.  He also asserted that, pursuant to EPI's request, he performed some site reclamation work, for which he was never compensated.

In addition to his own testimony about how the missing material might be accounted for, Georges also submitted a report prepared by an expert.  That expert opined that: (1) because EPI and Georges agreed that he would estimate the volume of material loaded into each truck (rather than actually measuring that material) and because the trucks generally would carry more than the estimated amount when full, as many as 72,900 cubic yards of material could have been removed and loaded, but not accounted for; (2) inaccuracies in the maps utilized by C&C accounted for another 58,000 cubic yards of material that EPI claimed Georges had wrongfully removed and not accounted for; and (3) based on other errors in C&C's calculations, its estimates were off by an additional 70,000 to 186,736 cubic yards of material.  Thus, according to Georges' expert, C&C's estimate for the total volume of material removed from the site between 1995 and 2000 could be off by as many as 316,900 cubic yards.

That margin of error, combined with the total volume of material Georges reported that he removed (247,062 cubic yards)

could roughly account for the total volume of material that C&C thought had been removed from the site.  In other words, if the reports prepared by both Georges' expert and EPI's expert were fully credited, it could not be said that it was more likely than not that Georges removed <u>any</u> material from the site that was not properly accounted for in his weekly estimated reports to EPI.

Following a four-day bench trial, the bankruptcy court issued its written decision.  The court identified the two factual issues presented to it as: (1) whether the evidence supported a finding that Georges removed material from the site that was not accounted for in the reports he submitted to EPI; and (2) if there was such "missing" material, its quantity and value.  Next, the court noted that, if Georges failed to account for excavated material in the reports he provided to EPI and, therefore, owed EPI additional money, a series of legal questions arose: (1) whether that debt should be excepted from discharge pursuant to section 523(a)(2) and/or (a)(4); and (2) whether Georges' failure to account for the material should bar his discharge under section 727(a)(3).

In the end, the bankruptcy court determined that, with some minor adjustments which the court made, C&C's initial estimation

9

of the volume of material removed from the site was credible,
well-supported, and reliable.  Of the two estimates provided by
C&C, the court adopted the more conservative one as its starting
point in determining whether Georges excavated material from the
site without accounting for it (the court rejected C&C's enhanced
estimate, reasoning that it had not adequately supported its view
that "fluff" and "swell" could account for an additional 132,000
cubic yards of material that C&C concluded were missing from the
site).

Next, the court adjusted that conservative estimate by
taking into account the parties' imprecise method (i.e., the "in
truck" method) of calculating the volume of material excavated by
Georges.  As to that issue, the court acknowledged Georges'
expert's view (that as many as 72,900 cubic yards had been "lost"
due to the rough accounting method), as well as the evidence
submitted by EPI and its expert challenging those calculations.
Ultimately, the court determined that 36,000 cubic yards
represented a reasonably accurate approximation of the total
volume of missing material attributable to the parties' imprecise
method of accounting.  Accordingly, it subtracted that amount
from the lower of C&C's calculations.  Finally, it subtracted the
amount of material Georges had accounted for, concluding that

Georges had removed a total of 148,035 cubic yards of material
that he failed to report.  After some additional calculations,
the court determined that the total value of the missing material
was $361,087.50.

Turning to the legal questions presented to it, the
bankruptcy court first concluded that "the unaccounted-for
property was not obtained by a misrepresentation or actual
fraud."  Bankruptcy order at 6.  Accordingly, the court found in
favor of Georges on EPI's claim under section 523(a)(2)(A).  As
to EPI's next claim, however, the court found that the facts of
the case warranted a finding of embezzlement under section
523(a)(4) – a conclusion that required, among other things, a
finding that the unaccounted-for property had been
"appropriat[ed] by [Georges] for a use other than intended,"
under "circumstances indicat[ing] fraud."  Bankruptcy order at 7.

Next, the court concluded Georges failed to maintain
adequate records of both materials removed from the site and
sales made to individual customers.  Accordingly, pursuant to 11
U.S.C. § 727(a)(3), the court denied Georges' discharge.  And,
finally, as to Georges' counterclaim, the court concluded that
there was "insufficient evidence to support a finding that loam

belonging to the Defendant remained on the premises."  Bankruptcy
order at 9.


## Discussion

I.   <u>Factual Findings of the Bankruptcy Court</u>.

  A.   Georges' Counterclaim.

  The bankruptcy court concluded that there was "insufficient
evidence to support a finding that loam belonging to the
Defendant remained on the premises."  Bankruptcy order at 9.
But, on the first day of the bench trial, Edward LeHoullier, one
of the principals of EPI, testified as follows:

> Q.   The loam pile, do you know how many cubic
>   yards of loam we're talking about,
>   approximately, that he's [Georges] claiming
>   ownership of?
>
> A.   I believe he claimed 2,500 yards.
>
> Q.   Okay.  Do you know, is that your loam or his
>   loam?
>
> A.   . . . . The loam was his.
>
> Q.   Is that loam pile still there?
>
> A.   . . . . We did screen that pile and keep it
>   separate.
>
> Q.   So it's still there as we speak today?
>
> A.   Yes.  Well, it's in a different location.
>
> Q.   Okay.
>
> A.   But it's separate.

Trial transcript, day one, pages 88:15 – 89:11.  Given Mr.
LeHoullier's concession, and the absence of any contradictory
evidence, the bankruptcy court's factual finding to the contrary
is plainly erroneous.  It is, therefore, reversed.


     B.   Material Georges Failed to Account For.

     The bankruptcy court explained why it credited (for the most
part) C&C's calculations as being generally more reliable and
credible than those offered by Georges' expert.  But, it did
adjust C&C's calculations downward by 32,000 cubic yards,
crediting (in part) Georges' expert's view that the "in truck"
method of accounting could itself account for a substantial
volume of legitimately missing material.  And, in concluding that
Georges was responsible for the balance of the missing material,
the court rejected his suggestions that: (1) third parties had
excavated material from the site after the 1995 topographical map
used by C&C had been prepared, but before he began excavation
operations; (2) third parties had access to, and removed material
from the site while he was occupying the site; and (3) adjoining
land owners, who were themselves running excavating operations,
encroached over the property line and removed some material from
the site.  In response to each such allegation by Georges, EPI
produced witnesses who flatly contradicted Georges' claim.

Nothing in the record suggests that the bankruptcy court committed error in crediting EPI's witnesses and resolving those credibility issues against Georges.

It is, perhaps, also worth noting that Georges' own credibility with the court was probably not enhanced when it was revealed that he had refused to produce his customer list during discovery, on grounds that it was "confidential."  Plainly, had that list been provided, EPI could have contacted Georges' customers, determined how much fill they purchased during the relevant period, and compared those figures to the figures Georges provided to EPI in his weekly reports.  See Bankruptcy order at 9 ("The Defendant argued that he did not produce those documents because he did not want the Plaintiff to know who his customers were for purposes of competition.  While this may have been a valid reason while the pit was operating, it was not valid at the time of trial since the pit was not operating and there was no competition.").

In light of the foregoing, and with the exception of the factual finding regarding loam left on the site by Georges, the court cannot say that the factual findings of the bankruptcy court are clearly erroneous.

14

II. Legal Conclusions of the Bankruptcy Court.

    A.   EPI's Claims Under 11 U.S.C. § 523(a)

    Section 523(a)(2)(A) of Title 11 excepts from discharge any

debt:

> For money, property, services, or an extension renewal,
> or refinancing of credit, to the extent obtained by (A)
> false pretenses, a false representation, or actual
> fraud, other than a statement respecting the debtor's
> or an insider's financial condition.

To sustain its burden of proof at trial as to is 523(a)(2)(A)

claim, EPI was required to prove the following: (1) Georges made

a false representation; (2) he did so with a fraudulent intent;

(3) he intended to induce EPI to rely on that false

representation; (4) EPI did, in fact, rely on that false

representation; (5) such reliance was justifiable; and (6) it

resulted in pecuniary loss to EPI. <u>See</u> <u>Palmacci v. Umpierrez</u>,

121 F.3d 781, 786 (1st Cir. 1997) (citations omitted).


    In its post-trial memorandum submitted to the bankruptcy

court, EPI summarized its 523(a)(2)(A) claim as follows:

> Defendant [Georges] represented to Plaintiff that he
> would "report weekly to [EPI] the amount taken and pay
> for the same . . . per cubic yard."  Moreover,
> Defendant knew his weekly cubic yardage reporting was a
> material representation to Plaintiff as there was no
> other mechanism or methodology to account for the
> material, and Plaintiff was to "invoice to its
> customers on said yardage."  Because this reporting of

cubic yards loaded was peculiarly within Defendant's
own knowledge, Plaintiff was justifiably relying on
Defendant [to] accurately report[] the cubic yards of
material sold. . . . Defendant's representations were
clearly false as to the actual quantity removed from
Plaintiff's pit or he had complete conscious
indifference to the truth.

EPI's post-trial memorandum, at 28–29.  In other words, EPI

claimed that Georges obtained the unaccounted-for fill from the

site by intentionally failing to accurately account for the true

volume of material he excavated and sold to his customers.  As to

that claim, however, the bankruptcy court concluded that "the

unaccounted-for property [i.e., the fill] was not obtained by a

misrepresentation or actual fraud," and it found in favor of

Georges.  Bankruptcy order at 6.


     Next, EPI claimed that Georges' debt to it should be

excepted from discharge under 11 U.S.C. § 523(a)(4).  In support

of that claim, EPI asserted that "Defendant did not accurately

account [for material removed from the site,] based on his own

admissions and on the enormous quantity of unaccounted for

material. . . . This Court can clearly infer fraudulent intent

given the facts of this case."  EPI's post-trial memorandum at

32.  In addressing EPI's claim, the court set forth the elements

of a section 523(a)(4) claim as follows:

    1.   the relevant property was rightfully in the
         possession of the non-owner;

    2.   the non-owner appropriated the property for a
         use other than [that] for which it was
         intended; and

    3.   the circumstances indicate fraud.

Bankruptcy order at 6 (citations omitted).  Applying that

standard, the bankruptcy court found in favor of EPI:

> The Court has already found that a significant amount
> of product was not accounted for.  The use of the
> property that was granted to the Defendant was to mine
> the property and to account for the product that was
> mined.  The amount of missing material clearly supports
> a finding that product that was not accounted for was
> appropriated by the Defendant.  Failure to account for
> this product was an appropriation by the Defendant for
> a use other than intended.  The Plaintiff has met its
> burden on the second element.  Finally, the Court finds
> that the circumstances indicate fraud. . . . Fraudulent
> intent may be determined by the surrounding facts and
> circumstances of the case.  In the instant case, the
> Court has found that the Defendant was in possession of
> the property and that a significant amount of material
> was not accounted for.  <u>Under these circumstances, the
> Court finds that an inference of fraud is warranted</u>.

Bankruptcy order at 7-8 (citations omitted) (emphasis supplied).


    Georges challenges those two legal conclusions as being

inconsistent, saying the bankruptcy court's finding that the

circumstances of the case warrant an inference of fraud is

directly at odds with its earlier finding that "the unaccounted-

                               17

for property was not obtained by a misrepresentation or actual fraud." <u>Id</u>. at 6.  The court disagrees.

As to EPI's 523(a)(2)(A) claim, the bankruptcy court concluded that Georges did not <u>acquire</u> <u>the</u> <u>fill</u> by fraud.  That is to say, Georges was, under the parties' agreement, permitted to excavate material from the site in accordance with the terms of their agreement.  Thus, the court concluded that he did not initially obtain the excavated material by fraudulent means.  As to EPI's 523(a)(4) claim, however, the bankruptcy court plainly concluded that, once he excavated that material, Georges "appropriated" it (by failing to account for, and pay for, it).  In other words, the court held that while Georges did not <u>obtain</u> the missing material by fraud (e.g., fraud in the inducement with respect to the parties' agreement), he <u>diverted</u> <u>and</u> <u>retained</u> it, converting it to his own use through fraudulent means (i.e., embezzlement — fraudulent conversion of the property of another by one who has lawful possession of the property).

The bankruptcy court's legal conclusions with respect to EPI's claims under sections 523(a)(2)(A) and 523 (a)(4) are not inconsistent or otherwise contradictory.  Rather, the court applied the appropriate legal standards and, based upon its earlier findings of fact, reached reasonable legal conclusions.

18

B.   11 U.S.C. § 727(a)(3)

EPI claimed that Georges' business records were inadequate under 11 U.S.C. § 727(a)(3), which provides, in pertinent part, that:

> The court shall grant the debtor a discharge, unless the debtor has . . . failed to keep or preserve any recorded information, including books, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).  In a prior opinion, the bankruptcy court described the parties' respective burdens under that section as follows:

> When a debtor's right to discharge is challenged under section 727(a)(3), the objecting party has the initial burden to establish that the debtor's records are inadequate for determining the financial affairs or business transactions of the debtor.  Once the objecting party has met its initial burden, the burden shifts to the debtor to establish either that the debtor maintained adequate books and records from which his financial condition can be ascertained or that the failure to keep adequate books and records can be justified under the circumstances.

In re Fagnant, 2005 WL 1244866, *3 (Bkrtcy. D.N.H. 2005) (citations and internal punctuation omitted), aff'd 377 B.R. 729 (1st Cir. B.A.P. 2006).

The bankruptcy court agreed with EPI and concluded that Georges failed to maintain adequate business records.  First, it noted that there was no reasonable or logical explanation given to account for Georges' failure to produce "source documents concerning materials he sold from the pit."  Bankruptcy order at 9.  It also noted that the "bank statements produced [by Georges] are of little help as individual transactions of receipts or payments cannot be identified."  Id.  And, neither Georges nor his counsel made any effort to link specific bank deposits with income he would have received from the sale of fill excavated from the site.

To be sure, the bankruptcy court failed to specifically address whether Georges' failure to maintain legally sufficient records was "justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).  As the court noted in Fagnant:

> Whether a failure to keep records, total or partial, will be justified is a question of fact to be determined in each instance under the particular circumstances of the case . . .  In short, what is required is records that are reasonable under the circumstances.  Furthermore, because the standard for a claim of failure to maintain records is based on reasonableness under all circumstances, the education and sophistication of the Debtor is relevant.  It is sufficient if the books and records are kept, if required at all, so as to reflect with a fair degree of accuracy, the debtor's financial condition and in a manner appropriate to his business.

<u>In re Fagnant</u>, 2005 WL 1244866 at *3.

In this case, having concluded that Georges' knowingly and intentionally submitted weekly reports to EPI that understated the volume of material that he had removed from the site and sold to his customers, the court necessarily (albeit implicitly) concluded that those false records were not justified under the circumstances of the case.  In light of the bankruptcy court's factual findings in this case, this court cannot conclude that it erred as a matter of law in concluding that, pursuant to 11 U.S.C. § 727(a)(3), Georges is not entitled to discharge.

**Conclusion**

In an effort to determine whether the debtor, Georges, knowingly under-reported the volume of material he actually excavated from the site owned by EPI, the bankruptcy court sought to determine precisely how much material was removed from the site during the period of time that Georges ran his excavating operations.  Importantly, however, the parties never agreed to maintain particular records designed to determine precisely how much material Georges excavated.  Instead, the record suggests that they agreed to employ a means by which to <u>approximate</u> such sums, understanding that the approximation would necessarily understate, to a degree, actual volume removed.  Accordingly, the

bankruptcy court, crediting at least a portion of Georges'
expert's report, "converted" the total volume of material
actually removed from the site into a figure that more accurately
represented the total volume of material that the parties'
agreed-upon accounting method would have yielded.  Based upon the
record that was presented to the bankruptcy court, this court
cannot conclude that its factual findings as to the volume of
material that Georges removed from the site and failed to account
for were clearly erroneous.

     As noted above, however, the bankruptcy court's finding that
Georges did not leave approximately 2,500 cubic yards of loam on
the site is contrary to the uncontradicted admission of one of
EPI's principals and, therefore, plainly in error.  Georges'
testimony, as well as that of one of EPI's principals, establish
that Georges did leave approximately 2,500 cubic yards of his own
loam on the site after he removed his excavation equipment.  That
portion of the bankruptcy court's order is, then, reversed.

     Georges failed to demonstrate that the bankruptcy court's
legal conclusions as to EPI's claims under 11 U.S.C. § 523(a)
were incorrect, inconsistent, or unsupported by the factual
record.  Nor did Georges show that the bankruptcy court erred as
a matter of law when it held that, pursuant to 11 U.S.C. §

727(a)(3), he is not entitled to discharge.  Those legal conclusions are, therefore, affirmed.

For the foregoing reasons, the bankruptcy court's order of July 1, 2005, is affirmed in part, reversed in part, and remanded for further proceedings consistent with this order.  The Clerk of Court shall close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 28, 2007

cc:  Nancy H. Michels, Esq.
     Jack S. White, Esq.
     US Bankruptcy Court, Clerk
     Victor W. Dahar, Esq.
     Geraldine L. Karonis, Esq.